DICK BIRDWELL v. STATE.

No. A-875. Opinion Filed April 18, 1912.

(122 Pac. 1128.)

*Appeal from District Court, Pontotoc County;*
*A. T. West, Judge.*

Dick Birdwell was convicted of larceny, and appeals. Affirmed.

*Stone & Maxey,* for plaintiff in error.

*Smith C. Matson* and *E. G. Spilman,* Asst. Attys. Gen., for the State.

PER CURIAM. The plaintiff in error was tried in the district court of Pontotoc county on a charge of stealing two mules, and on the 26th day of February, 1910, was convicted by a jury, and his punishment fixed at four years' imprisonment in the state penitentiary. The facts upon which this conviction is based are substantially as follows:

W. C. Mayberry, on behalf of the state, testified: That he lived at Wetumka; was in Wetumka on the 4th, 5th, and 6th of last August (1909); knows the defendant by sight; saw him there about that time; that the first time he saw defendant was when defendant and another man came into his office and wanted him to sell a team of mules for them; used to be a public auctioneer, and auctions occasionally now; that these parties wanted him to sell a team of mules, buggy, and harness for them; that the mules were small mules, one a bay, the other a brown, or dark bay; that defendant said his name was Bray, and the other said his name was Gray; that they started to sell the mules, and they bid them in; that he asked them about the title to the mules, and they said it was good, no mortgage or anything else; that he asked them where they lived, and they said they lived at Ada; that witness was suspicious; that he asked them if they could

give references, and if they knew anybody in Ada; that they said they knew parties six miles from Ada; that he asked them if they knew the city marshal at Ada, and they said they did not; that they could not give any references there, but could give references six or seven miles from Ada; that witness told the boys who were bidding on the mules; that one of them said they raised the mules; that both were present all the time; that this was in August; that he did not remember the exact date, but that it was about noon when the sale took place; that it was in 1909; that when he started to sell the mules and buggy and harness all together, and they had been bid up to something like $100, Mr. Gray came up to him and said to sell the mules separate from the buggy and harness; that he stopped, and started in on the mules, and that it was then he asked them about the title; that he asked them where they lived, and they said six miles from Ada; that the mules had been bid up to about $100, when Mr. Gray came up to him, and asked if he could not buy the mules in; that this was quite a while after he had cried the sale, and that at first he had told the buyers, if these men couldn't give any references, or show that the property was clear, they would not have to take the property, if it was knocked off to them; that, when Gray came to him and asked if the property could not be bid in by them, he told him it could, and Gray bid $5 for them, and witness knocked the mules off to him; that witness went to the city marshal, and then back to his business; that the city marshal did the rest of the business. Cross-examination: That Gray did most of the talking; that he said Bray owned the buggy and said he owned the mules; that witness did not think he heard Bray (accused) claim at any time that he owned either of them; that Gray did most of the talking; that witness believes Gray paid for the auctioneering—the one who did most of the talking; that they both talked a little in witness' office.

Monroe Reed, on behalf of the state, testified: That he was marshal at Wetumka in August, 1909; that he arrested a couple of parties there early in August; that one said his name was Bray, and the other said his name was Gray; that accused

was the man who said his name was Bray; that they were eating dinner in a restaurant when he first saw them; that it was 11 or 12 o'clock; that Mr. Mayberry pointed them out to him; that he watched them until they put the team up to sell it; that Mr. Gray bid the team in himself; that Gray said it did not go for what he wanted it to go for; that Gray is not here; that the other one bid the team up, and seemed very nervous; that witness then arrested both of them; that they said they lived near Ada, and that they had brought the team up there and were looking for a location, and that they wanted the team sold; that witness then phoned to the marshal at Ada, and he said he did not know anything about them; that witness telephoned to Bebee, and that some man answered the phone, and said the team had been stolen; that witness then put them in jail; and that Mr. Smith, the sheriff, came after them. Cross-examination: That Bray did most of the talking; that it was not the other man, but this one, he thought; that the other man, Gray, claimed the mules; that the other man was the one who seemed nervous. Redirect examination: That a negro came up with Mr. Smith; that Smith directed him to turn the mules over to the negro.

Tom Phillips, on behalf of the state, testified: That he lived near Maxwell, Okla.; that he knows Amos Sampson; that Sampson is his half-brother; that witness sold his homestead, and lived at different places; that in August, 1909, he lived two miles north of Bebee; that about that time he lost a couple of mules; that he got them from Mr. Smith at Wetumka, and took them back; that the city officer at Wetumka had them in charge; that Amos Sampson raised the mules; that they were two and three years old, respectively, when they were lost; that witness now owns the mules; that they were branded "Lazy Z" on the left shoulder; that one was a mouse-colored horse mule, and the other a light brown horse mule; that they were the same mules he got from the city marshal. Cross-examination: That witness did not know how the mules came in the possession of this man; that he knew nothing about it. Redirect examination: That he did not know where the mules were before they were taken; that

Amos Sampson lived at Lula Armstrong's place, two miles north of Bebee, in Pontotoc county.

George Wilfong, on behalf of the state, testified: That he is 26 years old, and lives a mile northwest of Bebee; that he lived on Charley Long's place, about a mile and a half from Bebee southwest; that he remembered the occasion of some mules being taken from Amos Sampson, a negro, out there; that witness and Dick Birdwell got them; that Dick Birdwell lived north of Bebee, about the same distance as witness lived south; that witness and accused took the mules at night; that when they got them they were in Pontotoc county; that witness went to Bebee that morning, got a rope from Bob Hatcher, and went down to the river; that witness went home; that witness and Birdwell left home together some time after dark; that they rode two horses; that the mules were at the negro's home when they got them, about 100 yards west of the house; that the mules were tied; that they went home, put the mules to witness' buggy, and took them on; that they stopped at Williamson's house, and stayed there until about 12 o'clock that day, when they went on and stopped at the place this side of where they were arrested; that they stayed all night there, and went on to Wetumka in the morning, where they arrived about 12 o'clock; that they put up the team and got dinner, and then hunted up the auctioneer and proceeded to sell the team; that they gave the names of Bray and Ray. Cross-examination: That witness had never told just exactly what he had told on the stand; that he had never before been asked the questions he was asked on the stand; that he had first told something like it to Rat Chester, his uncle; that he had told several others; that Birdwell was selling the mules, and that witness bid them in; that he was the one who claimed them, and that witness claimed the buggy and harness; that witness told Rat Chester this after he was arrested; that the reason he told it was because he was guilty of it; that it was the first time he was guilty of anything like this; that he gambles; that he had not gambled with Amos, the negro; and that he did not gamble with negroes; that Birdwell tried to trade the mules for some property and a horse to Oscar Williamson; that

witness never saw Oscar Williamson before, and did not tell him that he won the mules of a negro; that witness' uncle told him he would not help him if he did not tell the straight of it; that witness hired lawyers to defend him; that he did not know whether this would turn him loose or not, and that his lawyers had not told him; that when he went to get these mules, one of them was tied with a halter; that he never won them off Amos; that he did not know when Amos tied them up; that they looked for them and found them; that witness supposed they would be loose in the field; that witness knew Amos had these two mules some time; that the moon was shining, and that it was about the 1st of August; that it was a light night; that witness was walking when he went in the field, and that he had a rope in his hand; that he told Bob Hatcher he was going for a yearling with the rope; that they looked some time for the mules; that they put the mules in a wagon yard the next night; that witness still has the buggy and harness; that Dick Birdwell lived something like five miles and a half from where witness lived; that Birdwell lived about a quarter of a mile from Amos Sampson; that witness lived about four miles from Amos; that both went to Mr. Mayberry; and that witness paid him. Redirect examination: That Dick Birdwell fixed up this gambling defense in this case, he thought. Recross-examination: That witness has not tried to get some fellows to steal some horses since being arrested.

Oscar Williamson, on behalf of defendant, testified: That in August, 1909, he lived one mile southwest of Francis, in Pontotoc county; that he remembered the occasion of Dick Birdwell and George Wilfong stopping at his house one morning; that they were working a span of mules; that he was not acquainted with George Wilfong at that time; that witness went to the tank that morning to water some stock, and that Wilfong went with him; that Wilfong wanted to trade him the mules for a bay mule of his; that Wilfong told him he had won them, he believed, from a negro; did not know Wilfong at the time; that Birdwell and Wilfong stayed there two or three hours, and left about 12 o'clock; that they did not eat dinner; that they went north. Cross-

examination: That witness has known Dick Birdwell seven or eight years; that witness now lives three miles west of Purcell; that he has not for the past twelve months been associated with a good many criminals, nor has he run with them; that he did not run with Burwell and Jim Miller there; that he was not acquainted with them at all; that he did not live in Francis about a year before; that he is farming; that he did not have any conversation with Birdwell about this team.

Tom Cowger, on behalf of defendant, testified: That he lives north of Bebee; that he is engaged in farming; that he has lived there a little over a couple of months; that one year he made a crop south of Bebee and moved over on the river; remembers the circumstance of he and Wilfong going from the Widow Steele's in November of the previous year; that they were in a buggy, and were drinking whisky; that Wilfong said his friends told him to turn it off on Dick Birdwell, that that was the only way he could keep out of the pen, and that he won the mules off of the negro. Cross-examination: That it was some time the last of November; that the conversation took place on the road, where the Bebee road connects with the Ada and Maxwell road, on George Wilfong's place; that it was daytime; that witness took up the subpoena, and asked Wilfong why they were not both joined, and that Wilfong told him his friends had said he would have to turn it off onto Dick; that Wilfong had been drinking and seemed intoxicated.

Jim Dodgin, on behalf of the defendant, testified: That he lives at Bebee, had lived there nine years, and is a farmer; that he had known George Wilfong about four years; that he had known Birdwell about six years; that Wilfong came to where he and his brother were sawing wood one morning in the fall; that Wilfong talked about his case, and said he had won the mules off of the negro. Cross-examination: That he came up there and was inquiring about some horses, and got to talking about his troubles; that Wilfong said, if he turned state's evidence, he would lose his friends; and that he did not tell witness he was going to plead guilty in his case.

Dick Birdwell, in his own behalf, testified: That he has lived near Bebee five years; that he went to Wetumka with Wilfong at the time these mules were sold; that he told Wilfong that evening he was going off to look for a job, and that Wilfong told him he could leave in the buggy with him; that Wilfong said he had won the mules, and was going up there to get rid of them; that he could go along with him if he wanted to; that he did not go into the field with Wilfong to get the mules; that he stayed on the horse, while Wilfong went and got the mules; that he could not see the mules from where he was; that Wilfong said he had won the mules off this negro, and that the negro said he would tie them out in the field, because he did not want his brother to know he had lost them; that George had been gambling; that it was light, and about 10 or 11 o'clock; that Wilfong told him the mules were hitched; that one was tied up to a stump by a halter and the other with a bridle to a bush; that one had a bridle and one a halter; that Wilfong told him they were tied a hundred yards or so from the house; that there is a lot around the house; that there is a stable; that Wilfong came out close to where they were; that they went to Oscar Williamson's and ate breakfast; that Oscar and Wilfong went down to the tank or pond to water some horses that morning; that witness was not close enough to hear the conversation; that from Oscar's house they went to Holdenville; that they stayed there overnight; that Wilfong, before they got to Holdenville, said it might be a good idea for him to change his name, because they might inquire around for him for gambling; that witness told him, "all right"; that he had known him a good while and did not think he would do anything like that; that witness don't believe yet Wilfong stole them, but believes what Wilfong said; that witness told them his own name was Ray, and Wilfong said his name was Gray; that at Wetumka George did the talking, and got the auctioneer to sell the mules, or try to sell them; that George paid the auctioneer; that witness never claimed the mules; that he never claimed any of it; that George bought them; that George said he was going to bid them in if they did not bring what he wanted; that witness was not to get

any of the proceeds for the buggy and stuff, but was just going along with Wilfong, if he would pay his expenses; that witness was looking for a job, or any kind of work he could get. Cross-. examination: That witness was 33 years old; that he thought Rat Chestnut and George were trying to give him the worst·of it; that George had been living out in that part of the country ever since he had; that he did not know right where Oscar Williamson lived, but knew it was in the neighboorhood there somewhere; that witness has a family; that George told him he had won the mules; that witness told him, if he could prove it, that was the best; that George said there was not anybody there, and could not prove it; that that was when they were arrested; that Wilfong had told him he had won the mules before they went for them; that it was the same day; that Wilfong said the negro had tied them out there to keep his brother from knowing he had lost them that way.

Dr. Bearteet, on behalf of the defendant, testified: That he knew Amos Armstrong, the one who went by the name of Phillips and Armstrong and Sampson; that witness did not know whether he was a brother to Tom Phillips or not; that Amos Armstrong is the one who told him he had lost a span of mules gambling with George Wilfong; that Armstrong owed witness for some medicine he got for his sister; that he told witness, as soon as he sold his mules, he would pay him; and that the next time witness saw him, which was about a week from that time, he told witness he had lost the mules gambling, by playing poker. Cross-examination: That witness did not know when this was; thought it was some time in July or August; that one day witness saw him in regard to the money matter, and when he asked him why he did not pay him, and whether he had sold the mules or not, he said he had lost them in gambling with Wilfong.

Dick Birdwell, recalled by the state, testified: That he did not think he told Mr. Mayberry they were up there at Wetumka, and were just going through the country looking for a place, nor that they thought they would sell the team and go back home.

W. C. Mayberry, in rebuttal for the state, testified: That at Wetumka, that day, the defendant said they were looking for a place, driving through the country looking for a place, and that they thought they would sell their buggy and team and go home on the train; that it was the other man who owned the buggy, and the defendant who owned the team.

Dr. Bearteet, recalled by the state, testified: That this negro lives north of Bebee; that he knows Tom Phillips and George Wilfong; that he had known Wilfong for nearly three years.

D. O. Chestnut, on behalf of the state, testified in rebuttal: That George Wilfong agreed during the last court to plead guilty; that it was along in the fall; that Birdwell and Wilfong and Tom Cowger and Brand and witness were somewhere near the drug store, and that he (Birdwell) said he won these mules from that negro shooting craps.

Tom Cowger, recalled for the defendant in rebuttal, testified: That Dick Birdwell did not state in his presence and in the presence of Rat Chestnut that he (Dick Birdwell) won the mules shooting craps.

There are a number of assignments of error relied upon by the accused for reversal of this cause, some of which are technically correct. But the testimony points conclusively to the guilt of the accused, and we are unable to find any error sufficiently prejudicial to justify a reversal of the judgment. The judgment of the trial court is therefore affirmed, with direction to execute the same.